## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

MARTINEZZ BOWMAN,

     Plaintiff,

v.                             Case No. 3:22-cv-545-MMH-MCR

DAVID HARVEY and JAYME
GOHDE,

     Defendants.

_____

## O R D E R

**THIS CAUSE** is before the Court on Defendants' Motion for Summary Judgment (Doc. 81; Motion) filed by David Harvey and Jayme Gohde (collectively "Defendants") on July 31, 2023.[1] Plaintiff Martinezz Bowman responded on September 7, 2023. <u>See</u> Plaintiff's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 94; Response). Defendants then filed a brief in reply. <u>See</u> Reply in Support of Summary Judgment (Doc. 97; Reply) filed September 21, 2023. Accordingly, this matter is ripe for review.

_____

[1] The Court granted Deputy Harvey and Gohde leave to file a consolidated Motion. <u>See</u> Order (Doc. 75), entered July 24, 2023.

## I.     Background

This case involves a traffic stop that went awry. How the stop was initiated, and what happened during the stop, is largely disputed by the parties. And the dashcam video of the incident only reveals part of the story. What is clear, however, is that Bowman was driving a Dodge Charger when Defendants attempted to pull him over. Bowman did not immediately stop the vehicle, but continued driving until he reached a nearby trailer park. When Bowman stopped the vehicle at the trailer park, Defendants exited their police cruiser with their weapons drawn. A tense back and forth verbal exchange ensued, and Defendants ultimately deployed a K9 on Bowman which bit and injured Bowman's leg. Because the record contains varying descriptions of this incident, the Court will outline the facts as presented by Defendants, Bowman, and the dashcam video before determining what the undisputed facts of this case are.[2]

### A.     Defendants' Description of Events

Defendants Harvey and Gohde are Deputy Sheriff Officers with the Colombia County Sheriff's Office (CCSO).[3] See Declaration of David Harvey at

---

[2] Although the Court outlines the varying descriptions of events surrounding this case, for the purposes of resolving the Motion, the Court will ultimately view all disputed facts and reasonable inferences in the light most favorable to Bowman. The Court notes that these facts may differ from those ultimately proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

[3] Bowman, in his Response, requests that the Court strike numerous statements made by Defendants in the background section of their Motion. Response at 2, 7, 8, 11, 12. Bowman's request is due to be denied because it is procedurally improper. See Polite v. Dougherty Cnty. Sch. Sys., 314 F. App'x 180, 184 n.7 (11th Cir. 2008) (finding no error in the district court's

1 (Doc. 78-5; Harvey Declaration); Declaration of Jayme Gohde at 1 (Doc. 78-6; Gohde Declaration). Deputy Harvey is a canine officer, and is the trainer and handler for the CCSO's K9 named Drago. Harvey Declaration at 1–2. At the time of the incident, Deputy Gohde was a trainee who was in the early stages of her second training phase, and the night of the traffic stop marked her first time working with Deputy Harvey and Drago. Gohde Declaration at 2.

On the night of October 23, 2020, Defendants were on patrol in their Sheriff's office vehicle when they noticed a Dodge Charger cross the intersection of NW Johnson and US 441 with inoperable taillights. Harvey Declaration at 2. US 441 is a well-lit highway, so Deputy Harvey pulled behind the Charger and engaged his emergency lights to initiate a traffic stop. Id. at 3. The Charger did not pullover, and instead turned off of US 441 onto Gerson Lane. Id. Once the

---

denial of a motion to strike an affidavit because "motions to strike are only appropriately addressed towards matters contained in the pleadings; here, the affidavit was submitted as part of the motion for summary judgment, which is not a pleading"); Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC, 845 F. Supp. 2d 1241, 1252–53 (M.D. Fla. 2012). However, to the extent Bowman argues that several of the contentions made in Defendants' Motion are not properly supported by admissible evidence as required by Rule 56(c), Federal Rules of Civil Procedure, the Court construes these arguments as evidentiary objections and will consider them, where necessary, in its analysis of the Motion. See Addison v. Ingles Mkts., Inc., No. 3:11-CV-3 (CAR), 2012 WL 3600844, at *1–2 (M.D. Ga. Aug. 21, 2012); see also Rule 56(c)(2), 2009 advisory committee note ("There is no need to make a separate motion to strike.").

In making this determination, the Court notes that it does not rely on unpublished opinions as binding precedent, but they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."). Additionally, although decisions of other district courts are not binding, they may also be cited in this Order as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

Charger was on Gerson Lane, Deputy Harvey engaged his police cruiser's emergency siren. Id. The Charger still did not pullover, and continued driving until it eventually made a left hand turn into a dimly-lit trailer park. Id. at 4. Almost a full minute elapsed between the time Deputy Harvey initiated his emergency lights, and when the Charger came to a complete stop. Id. During this time, Defendants did not know who owned the Charger, who was driving it, where the driver was leading them, how many individuals were in the vehicle, or whether anyone in the vehicle was armed. Id. at 3–4. From Defendants' perspective, what started as a traffic stop had now elevated to a felony stop as the Charger had inoperable taillights, refused to stop in a lit area at the intersection of Gerson Lane and US 441, continued driving down Gerson Lane despite Deputy Harvey engaging his emergency lights and siren, and had led them into a poorly lit trailer park. Id. at 4. This series of events caused Defendants to be concerned for their safety as they did not know whether the driver of the Charger was leading them into an ambush. Id. at 3–4.

Accordingly, when the Charger came to a stop at the trailer park Deputy Harvey exited the police cruiser with his taser drawn, while Deputy Gohde exited the cruiser with her pistol trained on the vehicle. Id. at 4. Bowman remained in the Charger and Deputy Harvey ordered him multiple times to "put [his] hands out the window" and to "[k]eep your hands where I can see them." See Defendant Deputy Harvey's Dash Camera Footage at 02:04–02:12 (Doc.

78-8; Dashcam Video). Bowman became agitated and shouted "are you going to shoot me?" <u>Id.</u> at 02:02–02:21. Deputy Harvey repeated his order for Bowman to step out of the vehicle, but Bowman did not comply, and responded with "listen bro, come here; come get me, bro." <u>Id.</u> at 02:48–02:55. Deputy Harvey viewed this behavior by Bowman as threatening, and warned him that "I will release my dog if you do not step out of the vehicle." <u>Id.</u> at 02:55–02:58; Harvey Declaration at 5. When Bowman still did not step out of the Charger, Deputy Harvey retrieved Drago from the back seat of his police cruiser. Harvey Declaration at 5.

With Drago by his side, Deputy Harvey continued to order Bowman to step out of the Charger. <u>Id.</u> Bowman did not exit the vehicle, so Deputy Harvey warned him again that he was going to deploy Drago. <u>Id.</u> After this renewed warning, Bowman stepped out of the Charger, and Deputy Harvey ordered him to turn around and to keep his hands in the air. <u>Id.</u> at 4. Bowman did not comply with this command, and Deputy Harvey again stated that he was going to deploy Drago. <u>Id.</u> at 5. Bowman responded to Harvey's command with "send the dog, bro." <u>Id.</u> From Deputy Harvey's perspective, this behavior by Bowman was antagonistic and showed that he had no concern for his safety, or that of the officers. <u>Id.</u> Deputy Harvey was also concerned because Bowman had begun reaching his body and arms into the front seat of the Charger. <u>See</u> Deposition Transcript of Defendant David Harvey at 55 (Doc. 78-2; Harvey Deposition).

Deputy Harvey issued one last warning to Bowman and ordered him to comply with his command to turn around. Harvey Declaration at 5. When Bowman did not comply with this order, Deputy Harvey deployed Drago. Id.

Once Deputy Harvey deployed Drago, two female passengers exited the Charger. Gohde Declaration at 4. Deputy Gohde, who had taken cover behind the police cruiser and had her firearm trained on the Charger, holstered her firearm, and moved to secure the two passengers. Id. Meanwhile, Bowman jumped onto the hood of the Charger to avoid being bitten by Drago. See Plaintiff's Deposition Transcript at 167 (Doc. 78-1; Bowman Deposition). Drago was able to grab a hold of Bowman's right leg and dragged him to the ground. Id. at 167–68. A struggle between Drago and Bowman then ensued. Id. While Drago was biting Bowman's leg, Deputy Harvey approached Bowman and ordered him to place his hands behind his back. Harvey Declaration at 5. Bowman did not comply with this order, so Deputy Harvey forcefully placed handcuffs onto him. Id. Once Bowman was handcuffed, Deputy Harvey released Drago's hold on Bowman's leg. Id.

After the incident, EMS arrived on the scene. Bowman Deposition at 75. Bowman refused to be treated by EMS, and also refused to submit to a blood sample test as part of the CCSO's DUI investigation. Id. at 76; DUI Investigative Report at 7 (Doc. 78-12; DUI Report). Bowman was subsequently transported to a local hospital, but refused to be treated by the hospital staff

while there. <u>See</u> Informed Refusal for Partial Refusal of Care and AMA at 1 (Doc. 78-17; Informed Refusal Form). At some point, Deputy Harvey prepared and signed a warrant affidavit stating that Bowman had been driving under the influence, fleeing or attempting to elude, and obstructing without violence. Harvey Declaration at 5–6. Deputy Harvey also issued Bowman a warning for having inoperable taillights. <u>Id.</u> at 6. The state attorney ultimately dismissed Bowman's DUI charge, but his refusal to submit to the blood test resulted in a one-year suspension of his driver's license. <u>See generally</u> Notice of Nolle Prosequi (Doc. 79-1); Bowman Deposition at 159. On May 18, 2021, the state attorney's office filed an information charging Bowman with fleeing or attempting to elude based on the events of October 23, 2020. <u>See generally</u> Information (Doc. 79-2). On August 23, 2022, a jury acquitted Bowman of this charge. <u>See generally</u> Verdict Form (Doc. 79-3).[4]

---

[4] Defendants request that the Court take judicial notice of the Notice of Nolle Prosequi, Information, and Verdict Form filed in Bowman's state court criminal case. <u>See generally</u> Defendant's Request for Judicial Notice (Doc. 79). Bowman does not object to this request, and the Court finds that these documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, the Court takes judicial notice of: (1) the Notice of Nolle Prosequi in the case styled <u>State of Florida vs. Martinezz Rashadeem Bowman</u>, in the County Court of the Third Judicial Circuit, in and for Columbia County, Florida, Case No. CO-2020-001996-CT-A dated June 9, 2021 (Doc. 79-1); (2) the Information in the case styled <u>State of Florida vs. Martinezz Rashadeem Bowman</u>, in the Circuit Court of the Third Judicial Circuit, in and for Columbia County, Florida, Case No. CO-2021-000410-CF-A dated May 18, 2021 (Doc. 79-2); and (3) the Verdict Form in the case styled <u>State of Florida v. Martinezz Rashadeem Bowman</u>, in the Circuit Court of the Third Judicial Circuit, in and for Columbia County, Florida, Case No. CO-2021-000410-CF-A dated August 23, 2022 (Doc. 79-3).

**B.    Bowman's Description of Events**

On the night of the incident, Bowman took his mom's Dodge Charger to drive two friends to a nearby liquor store. Bowman Deposition at 52–53. After purchasing liquor from the store, he drove back to his house, taking US 441. Id. at 53, 58. Bowman traveled down US 441 for a period of time, made a left hand turn onto Gerson Lane, and noticed Defendants behind him with their police cruiser's emergency lights activated. See Affidavit of Martinezz Bowman at 2 (Doc. 94-2; Bowman Affidavit). Bowman knew at this point that he was being stopped by Defendants, but did not know why he was being pulled over. Id. at 1. Bowman did not know that the Charger's taillights were inoperable. Id. at 2.[5] Regardless, Bowman knew that he was required to pull over to the side of the road. Bowman Deposition at 63. He did not do so and instead continued driving down Gerson Lane because he was looking for a safe place to pull over, and his house was less than a half-mile away. Id. at 58–59. According to Bowman, although he did not immediately pull over, he remained in "constant communication with the officers" by driving at a reduced speed and using his turn signal—letting Defendants know that he intended to stop once it was safe to do so. Response at 6 (citing Bowman Deposition at 160).

---

[5] In the Response, counsel argues that the taillights were working properly and that it "was never confirmed that the taillights were inoperable." Response at 2. However, counsel's argument is not evidence and counsel cites no evidence in support of this contention.

Roughly fifteen seconds after Defendants first signaled Bowman to pull over, he made a left hand turn off of Gerson Lane and into the trailer park. Bowman Deposition at 193. The trailer park was well lit. Response at 5.[6] Once Bowman came to a stop, Defendants drew their firearms and began issuing commands. Bowman Deposition at 49. Bowman complied with all of the orders that he was given, and scared for his life, was begging to surrender. Bowman Affidavit at 2–3. At no point did he try and reach his body back into the Charger, nor did he ever pose a threat to Defendants' safety. Bowman Deposition at 66. Despite this, Deputy Harvey deployed Drago, and Bowman jumped onto the roof of the Charger to avoid being bitten. <u>Id.</u> at 167. But the dog attacked him. <u>Id.</u> Deputy Harvey then approached Bowman, kneed him in the back, and forcefully placed handcuffs on him. <u>Id.</u> at 49. In total, Drago attacked Bowman for two to three minutes. <u>See</u> Deposition of Patrice Jones at 107 (Doc. 94-11; Jones Deposition).

After the incident, EMS arrived on the scene. Bowman Deposition at 74. Bowman did not refuse medical treatment from EMS, but allowed them to transfer him to a local hospital. <u>Id.</u> at 76. At the hospital, Bowman did not want to be seen by the medical staff because Deputy Harvey was present and he "was trying to get away from [him]." <u>Id.</u> at 82. Bowman does not recall failing to

---

[6] While counsel for Bowman argues that the trailer park was "well lit," counsel points to no evidence to support this assertion.

submit to a blood test. Id. at 87. Nor does he recall when Deputy Harvey prepared and signed the warrant affidavit. Response at 13.

### C.   The Dashcam Video

Dashcam audio and video from Defendants' police cruiser captured portions of the events that transpired on the night of October 23, 2020. Some portions of the incident are captured by both audio and video, some portions are captured only by audio, while some portions are not captured at all. As such, the Court will describe what the dashcam video does and does not show.

Video from the dashcam shows Bowman driving down US 441 without the Charger's taillights on. Dashcam Video at 00:36. Defendants pull onto US 441 and follow behind the Charger. Id. at 00:40. Bowman continues traveling down US 441, turns his blinker on, and merges into the left turn lane.[7] Id. at 00:56. Defendants follow Bowman into the lefthand turn lane, engage the police cruiser's emergency lights, and a few seconds later Bowman turns left onto Gerson Lane.[8] Id. at 01:00–01:10. Once Bowman turns onto Gerson Lane, Defendants engage their police cruiser's emergency siren. Id. at 01:15. Despite the emergency siren being activated, Bowman continues driving down Gerson Lane for roughly thirty-five seconds before he engages his turn signal and turns

---

[7] The Court notes that the video shows that the Charger's taillights were not on, and the video also shows that the vehicle's turn signal and break lights were in working order.

[8] The audio from the dashcam is activated when Defendants engage the police cruiser's emergency lights.

left into the trailer park. Id. at 01:15–01:50. A few seconds after entering the trailer park, Bowman brings the Charger to a complete stop. Id. at 01:57. The total time from when Defendants engage the police cruiser's emergency lights on US 441 to when Bowman comes to a complete stop is roughly one minute. Id. at 01:00–01:57. Throughout this time, the video shows numerous places along Gerson Lane where Bowman could have pulled over. Id. at 1:10–01:45.

Once Bowman stops at the trailer park, the only thing that can be seen on the video is Deputy Gohde positioned on the right-hand side of the police cruiser with her firearm trained in the direction of the Charger. Id. at 02:00. The video does not show Deputy Harvey, Drago, Bowman, the Charger, or the alleged use of excessive force. From this point forward, the dashcam's audio is the only thing that sheds light on the events that transpired. This audio reveals that once Bowman stops the Charger, Deputy Harvey repeatedly yells "driver stop," "put your hands out the window," "do not move," and "do you understand me?" Id. at 02:00–02:10. Bowman can be heard shouting back "you going to shoot me?" Id. at 02:05. A phrase he repeats numerous times. Id. at 02:02–02:12. Deputy Harvey then tells Deputy Gohde to call for back up, which she does, id. at 02:13–02:20, and Bowman can be heard saying numerous times "record this shit." Id. at 02:28. While this is going on, the passengers in the Charger can be heard telling Bowman to "put your hands out." Id. at 02:31. Deputy Harvey then issues numerous commands to Bowman telling him to "step out of the vehicle

slowly." Id. at 02:37–02:47. Bowman responds with "you're not going to shoot me." Id. at 02:42–02:52. And tells Defendants, "listen bro, come here; come get me, bro." Id. at 02:48. Deputy Harvey tells Bowman that "I will release my dog if you do not step out of the vehicle," id. at 02:54, and he tells Deputy Gohde that he's going "to pull [his] dog." Id. at 03:00. The video does not show Deputy Harvey getting Drago from the backseat of the police cruiser, but neither party disputes that this occurred, although they do dispute the exact timing of when this happened. Motion at 8; Response at 10.

Bowman then tells Deputy Harvey "this is my house, bro. You're not going to shoot me, bro. This is my house right here." Dashcam Video at 03:02. Bowman further shouts "you got the red beams on me, for what. What you got a gun on me for? Why you got a gun pointed at me, bro. That's disrespectful, bro." Id. at 03:08. Deputy Harvey then tells Bowman "last warning. Sheriff's dog K9[,]" id. at 03:25, and Bowman responds with "you want me to get out?" Id. at 03:27. At this point, the video does not show Bowman exiting the Charger, but the parties agree that Bowman does exit the vehicle. Response at 11; Motion at 8. Once Bowman exits the Charger, Deputy Harvey tells him "you better stop. Stay right there. Turn around and face away from me now." Dashcam Video at 03:30. Bowman responds "for what, bro?" Id. at 03:35. And Deputy Harvey tells him that "I will release this dog if you do not." Id. at 03:37. In response, Bowman tells Deputy Harvey to "send the dog, bro." Id. at 03:39. Deputy Harvey issues

another warning to Bowman, telling him to "put your hands up. Turn around and face the other way. Now. Slowly. I said slowly. Back towards me. Do not face me; face the other way." Id. at 03:40. Bowman again responds with "send the dog, bro." Id. at 03:53. Deputy Harvey states "last warning," and then says "K9–nine, nine, nine, nine, nine."[9] Id. at 03:55. Although the video does not show it, the parties agree that Deputy Harvey deployed Drago. Motion at 9; Response at 12. Once Drago is deployed, the audio captures Bowman repeatedly yelling "oh my God;" "help me;" "get that dog off me, bro;" and "my leg." Dashcam Video at 03:57–04:14. The video then captures two female passengers exiting the Charger and Deputy Gohde holstering her weapon to secure them. Id. at 04:18–04:30. While this is happening, Bowman can be heard saying "I'm sorry" and repeatedly saying "get the dog off me, bro." Id. at 04:32. At time stamp 04:51 Bowman can be heard sighing and stops yelling. Id. at 04:51. The dashcam audio is then largely quiet for about a half of a minute. Id. at 04:51–05:23. Next, another officer arrives on the scene, and at time stamp 05:23 Deputy Harvey can be heard saying "he's off the mans [sic]." Id. at 05:23. Bowman is then heard complaining to Deputy Harvey and the other officer about his leg. Id. at 05:31–06:07. At time stamp 06:07 Deputy Harvey is seen

---

[9] There is some confusion as to whether Deputy Harvey said "nine" or "nein." Drago was trained to respond to German commands, one of which is "nein," meaning "no" in German. Deputy Harvey testified, however, that he did in fact shout "nine." Harvey Deposition at 41–42. Either way, the parties do not dispute the substance of what Deputy Harvey said, nor do they contend that it is material to this case.

on the dashcam video walking around the other side of the Charger with Drago. <u>Id.</u> at 06:07. At no point does the video show the use of Drago on Bowman, nor does it capture how long Drago attacked Bowman. However, the audio and video establish that the longest the attack could possibly have lasted is two minutes and twelve seconds—the time from when Deputy Harvey announces that he is deploying Drago to when Drago can be seen on the dashcam video on the opposite side of the vehicle from where Bowman was apprehended. <u>Id.</u> 03:55–06:07.

## II.    Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[10] An issue is genuine when the evidence is such

---

[10]   Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of

that a reasonable jury could return a verdict in favor of the nonmovant. <u>See</u> <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Kesinger ex rel. Est. of Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the

---

the decisional law construing and applying these phrases.

<u>Id.</u> "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." <u>Campbell v. Shinseki</u>, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>McCormick v. City of Ft. Lauderdale</u>, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Discussion

Bowman asserts three claims against Deputy Harvey: (1) excessive force under 42 U.S.C. § 1983, (2) malicious prosecution under 42 U.S.C. § 1983, and (3) battery under state law. Amended Complaint at 24, 31, 37 (Doc. 29). Bowman also asserts two claims against Deputy Gohde: (1) excessive force under 42 U.S.C. § 1983 and (2) battery under state law.[11] <u>Id.</u> at 26, 33. As to the excessive force claims, Defendants argue that they are entitled to qualified immunity because the force used against Bowman did not violate the Fourth

---

[11] Bowman brought additional claims in his Amended Complaint, but the Court dismissed those other claims upon consideration of Defendants' Motion to Dismiss. <u>See</u> Order (Doc. 47), entered March 17, 2023.

Amendment, and that even if it did, this violation had not been clearly established. Motion at 22, 26. Bowman contends that the force used by Defendants was in violation of his Fourth Amendment rights and that this violation was clearly established. Response at 25. As to the malicious prosecution claim, Deputy Harvey argues that he did not violate the Fourth Amendment because he had probable cause to swear out the warrant affidavit. Motion at 31. Bowman contends that Deputy Harvey lacked probable cause to swear out the warrant affidavit because he did not commit any crimes the night of the incident. Response at 31. Finally, as to the battery claims, Defendants argue that they are not liable as the force used during the incident was reasonable. Motion at 33. Bowman counters that Defendants are liable because the force used was excessive. Response at 35. For the reasons discussed below, the Court finds that Defendants' Motion is due to be granted in-part and denied in-part.

### A.    Applicable Facts

Before addressing the parties' arguments, it is necessary for the Court to determine what the material undisputed facts of this case are. Although the general rule at summary judgment is that the Court must view all evidence in the light most favorable to the non-moving party, the Supreme Court in <u>Scott v. Harris</u>, 550 U.S. 372 (2007) acknowledged an important exception to this principle. In <u>Scott</u>, the defendant officer hit the plaintiff's vehicle in an attempt

to stop what he described as a high-speed chase. Id. at 375. The plaintiff brought an excessive force claim arguing that it was unnecessary for the defendant to hit his car because he remained in control of his vehicle throughout the chase, was driving at a reduced speed and using his turn signals, and was not a threat to any pedestrians or motorists. Id. at 375–79. When the Supreme Court reviewed the video recording of the incident, however, it concluded that "[t]he videotape t[old] quite a different story," and that the plaintiff's "version of events [was] so utterly discredited by the record that no reasonable jury could have believed him." Id. at 379–80. Accordingly, the Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. at 380.

The Eleventh Circuit recently noted that "Scott's rule has its limits." Brooks v. Miller, 78 F.4th 1267, 1271 (11th Cir. 2023). In doing so, the court explained that "before [the Court] can disregard the non-moving party's version of events: (1) the recording (or other evidence) must 'so utterly discredit[ ]' the party's story 'that no reasonable jury could have believed' that party, and (2) there must be no evidence that the recording has been 'doctored or altered[.]'" Id. at 1278 (internal citations omitted) (quoting Scott, 550 U.S. at 378–380). Consequently, "if a valid recording completely and clearly contradicts a party's

testimony, that testimony is not credible, and the court should disregard it. But if the recording renders a party's story merely unlikely yet does not necessarily contradict it, the default rule kicks in: we must accept the party's version for purposes of considering the motion for summary judgment." Id. (internal citation omitted). As such, "[w]hen the action happens off camera and the audio doesn't clearly contradict the plaintiff's story, Scott's rule becomes irrelevant." Id. at 1271–72.

Here, the parties do not contend that the dashcam video has been altered or doctored. Therefore, the only question is whether the dashcam video, and the evidence presented in the record, clearly discredit Bowman's version of events. In making this determination, the Court will apply the principles enunciated in Scott and Brooks.

First, Bowman disputes that US 441 "is a well-lit highway," and that the trailer park was "dimly-lit" the night of the incident. Response at 4–5. Bowman has cited no evidence in the record to support this contention, and relies only on arguments made by counsel in the Response. Moreover, the dashcam video makes it obvious that on the night of the incident US 441 was better lit than Gerson Lane and the trailer park. Thus, Bowman has failed to raise this issue as a disputed fact, and even if he had, the dashcam video clearly discredits his characterization. Accordingly, the Court will not view this fact in his favor.

Second, Bowman disputes "that Harvey engaged his emergency lights and [that he] then began the turn onto Gerson Lane." Id. at 4. According to Bowman, he "had already initiated his turn onto Gerson Lane when the lights came on." Id. This assertion is clearly discredited by the dashcam video. Although Bowman had turned on his turn signal, Deputy Harvey can be seen initiating the police cruiser's emergency lights while Bowman is still travelling on US 441 and before Bowman had begun to turn onto Gerson Lane. Dashcam Video at 01:00–01:10. Therefore, the Court will disregard Bowman's version of events as to this fact.

Third, Bowman disputes that there was "ample space" along Gerson Lane where he "could have pulled over." Response at 5. The dashcam video, however, clearly shows numerous places along Gerson Lane that Bowman could have stopped if he had chosen to do so. Dashcam Video at 1:10–01:45. Therefore, the dashcam video affirmatively discredits Bowman's version of events, and the Court will not view this fact in his favor.

Fourth, Bowman disputes that "by the time he came to a complete stop, almost a full minute had elapsed from the time he noticed the lights." Response at 6 (emphasis added). He contends that he "came to a complete stop less than 45 seconds [after] being signaled by lights and sirens." Id. This is not actually disputed. Specifically, Defendants do not dispute when Bowman noticed that he was being pulled over. Nor do they dispute that he stopped at the trailer park

roughly forty-five seconds after being signaled to pullover with lights and sirens while on Gerson Lane. Instead, Defendants note that the total time from when Bowman was ordered to stop on US 441 to when he actually pulled over in the trailer park was roughly one minute—the timeframe that the dashcam video affirmatively establishes. Dashcam Video at 01:00–01:57. Thus, there is not a genuine dispute of material fact as to when Bowman was signaled to pullover and when he came to a complete stop.

Fifth, in the Response Bowman, through counsel, disputes that his taillights were not working, arguing that the "taillights were never confirmed to be inoperable." Response at 7. However, the dashcam video establishes that the Charger's taillights were not on while Bowman was driving down US 441. Dashcam Video at 00:36. Thus, the Court will not credit this unsupported version of events as to this fact.

Sixth, Bowman disputes that "Gohde pointed her firearm at the vehicle and kept her firearm on the vehicle until the scene was under control and there was compliance." Response at 8–9. According to Bowman, "Gohde's gun remained pointed at Plaintiff throughout the entire incident as the assisting officer." Id. at 9. The dashcam only shows the general direction in which Deputy Gohde pointed her firearm. Therefore, it cannot be said that the video clearly contradicts Bowman's version of events. Consequently, the Court will adopt Bowman's version of events as to this fact.

Seventh, Bowman disputes that he "refused to comply with Harvey's commands." Id. at 12. However, this argument is refuted by Bowman's own testimony. For example, Bowman testified that he was aware that Defendants were trying to pull him over, but that he continued driving nonetheless:

> Q. Did you know that Deputy Harvey was a law enforcement officer when he was trying to stop your vehicle?
>
> A. Yes.
> . . .
> Q. Okay. So why didn't you stop when you immediately noticed that the deputy had his lights and was behind your vehicle?
>
> A. Nowhere to pull over.

Bowman Deposition at 51, 58. Bowman also testified that he did not comply with Deputy Harvey's commands to turn around:

> Q. Okay. When [Deputy Harvey] asked you to turn around and walk backwards to him did you do that?
>
> A. No . . . .
>
> Q. So you put your hands out of the window. And as you sit here today you're saying you followed all of the deputy's commands, is that what you're saying?
>
> A. As far as turning your back to a gun and a dog, that's the only command I didn't follow.

Id. at 65–66. Additionally, Bowman testified that he did not willingly place his hands behind his back when ordered to do so by Deputy Harvey:

> Q. Okay. The question is did you allow Deputy Harvey to handcuff you, yes or no?

A. The dog was already biting me . . . <u>He kneed me and without my will like willed the handcuffs on me</u>, that's what he did. Did I allow him to? I guess I didn't have a choice.

Q. You didn't put your hands behind your back willingly to be handcuffed, did you?

. . .

A. I'm getting bit by a dog at that time, ma'am. I don't – my movements are through pain at that moment, like . . .

Q. Okay. The question is did you put your hands willingly behind your back to be handcuffed?

A. I don't remember.

<u>Id.</u> at 68–69 (emphasis added).

Although Bowman argues that he complied with all of Defendants' commands throughout the incident, his own testimony shows that he did not. Indeed, the record unequivocally establishes that Bowman failed to comply with at least three of Defendants' orders. The Court will therefore disregard Bowman's version of events as to these three instances of non-compliance. As to the other orders given by Defendants during the incident, however, the Court will accept Bowman's version of events as the video does not show him failing to comply.

Eighth, Bowman disputes that he "reached his head or body into the vehicle" once he was stopped at the trailer park. Response at 12. As the dashcam video does not capture this event, it cannot be said that the video clearly

contradicts Bowman's version of events. Therefore, the Court will view this fact in Bowman's favor.

Ninth, Bowman agrees that Deputy Harvey deployed Drago, but disputes "that the dash cam audio captures when" this occurred. Response at 12. Bowman contends that the "jury is free to draw its own conclusions as to the timing" of Drago's deployment. Id. This argument fails for two reasons. First, "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record[.]" Fed. R. Civ. Pro 56(c). Therefore, to survive summary judgment, the "non-moving party must go beyond the pleadings and 'identify affirmative evidence' that creates a genuine factual dispute." Lexmark Int'l Inc. v. Universal Imaging Indus., LLC, No. 8:18-cv-1047-WFJ-AEP, 2023 WL 6688588, at *3 (M.D. Fla. Oct. 12, 2023) (quoting Crawford-El v. Britton, 523 U.S. 574, 600 (1998)). Here, Bowman has failed to cite any evidence in the record to dispute Deputy Harvey's statement that he deployed Drago when he shouted "last warning" followed by "K9, nine, nine, nine, nine[.]" Harvey Deposition at 109–110. Thus, Bowman has failed to create a genuine dispute as to this fact. Next, Bowman's own testimony actually confirms that this is when Deputy Harvey deployed Drago. Specifically, Bowman testified that "[Deputy Harvey] said last warning, and following the last warning he released the dog." Bowman Deposition at 164. For these reasons, Bowman has failed to create a genuine dispute as to the timing of when

Deputy Harvey deployed Drago. Moreover, the undisputed record shows that Drago was deployed after Deputy Harvey issued his "last warning."

Finally, Bowman disputes that "the dashcam audio captures when K9 Drago was . . . removed" from his leg. Response at 12. Instead, he again contends that the "jury is free to draw its own conclusions as to . . . how long Drago remained on [him]." Id. The only evidence that Bowman cites is the deposition of Patrice Jones, in which she states that Drago remained on Bowman for "about two, three minutes." Jones Deposition at 107. The record, however, reveals that the longest the attack could have lasted for is two minutes and twelve seconds—the time from when Deputy Harvey announced that he was deploying Drago to when Drago is seen on the dashcam video with Deputy Harvey on the opposite side of the vehicle from where Drago apprehended Bowman. Dashcam Video at 03:55–06:07. Thus, the Court will use this amount of time in addressing the merits of Bowman's arguments.[12]

---

[12] The Court notes that it has serious doubts that Drago's attack actually lasted this long. Notably, the dashcam video, and the record, show that Deputy Harvey deployed Drago at 03:55. Dashcam Video at 03:55. After Drago is deployed, Bowman can be heard yelling "oh my God;" "help me;" "get that dog off me, bro;" and "my leg." Id. at 03:57–04:51. At 04:51 Bowman can be heard sighing. Id. at 04:51. At this point, Bowman stops yelling, and the dashcam audio is largely quiet for about thirty seconds. Id. at 04:51–05:23. Another officer then arrives on the scene, and Deputy Harvey can be heard saying "he's off the mans [sic]." Id. at 05:23. Bowman is then heard complaining to Deputy Harvey and the other officer about his leg. Id. at 05:31–06:07. Deputy Harvey is next seen on the dashcam video walking on the opposite side of the Charger with Drago. Id. at 06:07. Using these points of reference, there are four separate periods of time that the attack could have lasted. First, the attack could have lasted **fifty-six seconds**—the time from when Drago was deployed to when Bowman sighs and stops yelling. Id. at 03:55–04:51. Second, the attack could have lasted **one minute and twenty-eight seconds**—the time from when Drago is deployed to when Deputy Harvey says

As to when Drago released the hold of Bowman's leg, Deputy Harvey testified that "I finally got [Bowman's] hands forced behind his back and handcuffed him. When [Bowman] was handcuffed [Drago] was removed." Harvey Deposition at 84. Bowman has cited no evidence to dispute Deputy Harvey's testimony. Instead, Bowman, through counsel, only generally disputes this fact, contending that the "jury is free to draw its own conclusions as to" when Drago's hold was released. Response at 12. As noted above, this is insufficient to create a genuine dispute of material fact, as the "non-moving party must go beyond the pleadings and 'identify affirmative evidence' that creates a genuine factual dispute[.]" Lexmark Int'l Inc., 2023 WL 6688588, at *3 (quoting Britton, 523 U.S. at 600). By failing to cite any evidence in the record to dispute Deputy Harvey's testimony, Bowman has failed to create a genuine dispute as to when Deputy Harvey released Drago's hold from Bowman's leg. For this reason, the Court finds that the undisputed record

---

"he's off the mans [sic]." Id. at 03:55–05:23. Third, the attack could have lasted **one minute and thirty-six seconds**—the time from when Drago is deployed to when Bowman can be heard complaining about his leg. Id. 03:55–05:31. Finally, the longest the attack possibly could have lasted is **two minutes and twelve seconds**—the time from when Deputy Harvey announces that he is deploying Drago and when Drago can be seen on the dashcam video on the opposite side of the vehicle from where he apprehended Bowman. Id. 03:55–06:07. Since the dashcam video and audio do not definitively establish the first three periods of time, the Court will use the absolute longest the attack could have lasted, which is two minutes and twelve seconds. In doing so, the Court notes that it is viewing the facts in a light more favorable than what Bowman is likely entitled. Indeed, Drago necessarily must have been off of Bowman before he is seen on the opposite side of the Charger with Deputy Harvey, so there is no plausible way that the attack actually could have lasted a full two minutes and twelve seconds. Nonetheless, the Court will give Bowman's facts more deference than they are entitled, and use this period of time in analyzing the merits of the Motion.

shows that Deputy Harvey released Drago's hold once Bowman was secured in handcuffs.[13]

Having applied <u>Scott</u> and <u>Brooks</u>, the Court disregards the portions of Bowman's version of events that are clearly contradicted by the record, but construes all facts not clearly contradicted in Bowman's favor. Accordingly, the Court finds that the material facts of this case for the purposes of summary judgment are as follows: On the night of October 23, 2020, Defendants observed Bowman driving down US 441 without illuminated taillights. Dashcam Video at 00:36. Defendants turned onto US 441, following behind Bowman, and engaged the police cruiser's emergency lights just before Bowman turned onto Gerson Lane. <u>Id.</u> at 00:40–01:10. Once the Charger turned onto Gerson Lane, Defendants engaged the emergency siren. <u>Id.</u> at 01:16. On Gerson Lane, there were numerous spots along the road that Bowman could pullover, yet he continued driving for roughly another forty-five seconds before pulling into the trailer park and bringing the Charger to a complete stop. <u>Id.</u> at 01:15–01:57.

Once the Charger stopped at the trailer park, the audio from the dashcam reveals a tense back and forth exchange between Deputy Harvey and Bowman. During this exchange, Bowman eventually complied with Deputy Harvey's

---

[13] Bowman disputes other facts. <u>See generally</u> Response. Upon consideration of these facts, however, the Court does not deem them to be material in resolving the Motion. Accordingly, the Court does not resolve these disputes here, but views these facts in the light most favorable to Bowman.

initial commands and exited the vehicle, but failed to follow the orders to turn around and to walk backwards towards the officer. Bowman Deposition at 66. During the verbal exchange between Deputy Harvey and Bowman, Deputy Harvey retrieved Drago from the backseat of his police cruiser, and then deployed him after Bowman told Deputy Harvey to "send the dog, bro" and refused to turn around. Harvey Deposition at 109; Dashcam Video at 03:55. Before Drago was deployed, Bowman did not reach his hands or body back into the Charger. Bowman Deposition at 66. Once Deputy Harvey deployed Drago, Bowman jumped onto the roof of the Charger, and Drago grabbed his right leg dragging him to the ground. Id. at 167. A struggle between Bowman and Drago ensued. Id. at 167–68. During this time, Bowman yelled "I'm sorry" and "get the dog off me, bro." Dashcam Video at 03:57–04:51. Deputy Harvey then approached Bowman and ordered him to place his hands behind his back, Bowman did not comply, and Deputy Harvey placed his knee on Bowman's back and forcibly handcuffed him. Bowman Deposition at 68–69. Once Bowman was handcuffed, Deputy Harvey released Drago from his leg. Harvey Deposition at 84. While this was going on, Bowman stopped yelling, Dashcam Video at 04:51, and another officer arrived at the scene. Id. at 05:16. Deputy Harvey then said "he's off the mans [sic]." Id. at 05:23 And Bowman began complaining to Deputy Harvey and the other officer about his leg. Id. at 05:31–06:07. Deputy Harvey then walked around to the other side of the Charger with Drago. Id. at

06:07. Drago attacked Bowman for no more than two minutes and twelve seconds. <u>Id.</u> 03:55–06:07.

When EMS arrived on the scene of the incident, EMS did not treat Bowman, but did transport him to a nearby hospital. Bowman Deposition at 76. While at the hospital, Bowman refused to be treated by the medical staff. <u>Id.</u> at 82; Informed Refusal Form at 1. Bowman also refused to submit to a blood sample test. Bowman Deposition at 87; DUI Report at 7. At some point, Deputy Harvey prepared and swore out a warrant affidavit alleging Bowman to have been driving under the influence, fleeing or attempting to elude, and obstructing without violence. <u>See generally</u> Warrant Affidavit (Doc. 78-9). Deputy Harvey also issued Bowman a warning for having inoperable taillights. <u>See generally</u> Florida Uniform Traffic Citation (Doc. 78-13). The state attorney eventually dismissed Bowman's DUI charge, but his license was suspended as a result of failing to submit to the blood sample test. <u>See generally</u> Notice of Nolle Prosequi; Bowman Deposition at 159. The state attorney later charged Bowman with fleeing or attempting to elude. <u>See generally</u> Information. And a jury ultimately acquitted Bowman of this charge. <u>See generally</u> Verdict Form.

Having determined the material facts of this case for the purpose of summary judgment, the Court will now consider the arguments raised by the parties.

**B.    Excessive Force – Deputy Harvey (Count I)**

In Count I, Bowman asserts that Deputy Harvey used unconstitutionally excessive force by deploying Drago. Amended Complaint at 25. Deputy Harvey requests entry of summary judgment arguing that he is entitled to qualified immunity because his use of Drago was constitutional as a matter of law, and even if his use of Drago was excessive, that his conduct violated the Constitution had not been clearly established at the time of the incident. Motion at 11.

The doctrine of "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, this defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[14] Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003). Indeed, as "'[g]overnment officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful[.]"

---

[14] In determining whether a defendant is entitled to qualified immunity, courts view the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then consider "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000); Scott, 550 U.S. at 381 n.8.

Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, a defendant bears the initial burden of showing that his conduct was within the scope of his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007); Lee, 284 F.3d at 1194. Here, it is undisputed that, at all times material to this case, Deputy Harvey was acting in his official capacity and within the scope of his discretionary authority.[15] Accordingly, the burden shifts to Bowman to demonstrate that qualified immunity is not appropriate using the test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001).

In accordance with Saucier, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the [deputy's] conduct violated a constitutional right[.]" Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott, 550 U.S. at 377). The court must also ask whether the right allegedly violated was clearly established at the time of the violation. Hope, 536 U.S. at 739; Saucier,

---

[15] "'A government official acts within [their] discretionary authority if the actions were (1) undertaken pursuant to the performance of [their] duties and (2) within the scope of [their] authority.'" Jones v. City of Atlanta, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam) (quoting Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. See Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004); see also Lee, 284 F.3d at 1194 (finding that "there can be no doubt that [the officer] was acting in his discretionary capacity when he arrested [the plaintiff]," even though the plaintiff asserted that the officer used excessive force in the manner in which he was arrested).

533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct") (internal quotations omitted). The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009);[16] Underwood, 11 F.4th at 1328.

i. Excessive Force

Addressing the first question, the Court must determine whether Deputy Harvey subjected Bowman to an unlawful use of force on the night of October 23, 2020. Specifically, the Court must evaluate whether Deputy Harvey applied excessive force when he deployed Drago on Bowman, and allowed Drago to attack Bowman. In conducting this analysis, the Court heeds the Supreme Court's caution that:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

---

[16] In Pearson, the Supreme Court modified the procedure mandated in Saucier, permitting courts the discretion to determine which prong of the qualified immunity analysis should be resolved first. See Pearson, 555 U.S. at 236.

> governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Graham v. Connor, 490 U.S. 386, 396–97 (1989) (internal citations and quotations omitted); see also Croom v. Balkwill, 645 F.3d 1240, 1251–52 (11th Cir. 2011); Draper v. Reynolds, 369 F.3d 1270, 1277–78 (11th Cir. 2004); Durruthy v. Pastor, 351 F.3d 1080, 1093–94 (11th Cir. 2003). Consistent with this authority, a court uses the (1) severity of the crime, (2) danger to officer safety, and (3) risk of flight, referred to as the Graham factors, to analyze the

reasonableness of an officer's use of force. See Lee, 284 F.3d at 1198. Indeed, "Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Id.; see also Taylor v. Taylor, 649 F. App'x 737, 746 (11th Cir. 2016). Significantly, "an officer will be entitled to qualified immunity . . . if an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

As to the first Graham factor—the severity of the crime at issue—the parties dispute what crime Bowman was thought to have committed. Bowman contends that he merely committed a non-violent traffic equipment violation by driving with inoperable taillights. Response at 22. However, Deputy Harvey argues that although the incident originally started as a traffic stop, it elevated to a "felony stop" when Bowman refused to pullover. Motion at 18. Pursuant to Florida Statute section 316.1935(2), "[a]ny person who willfully flees or attempts to elude a law enforcement officer in an authorized law enforcement patrol vehicle, with agency insignia and other jurisdictional markings prominently displayed on the vehicle, with siren and lights activated commits a felony of the third degree[.]" Id. "The elements of [this] crime are: '(1) an officer in a law enforcement patrol vehicle, with its jurisdictional markings

prominently displayed and its siren and lights activated, orders the motorist to stop; and (2) the motorist willfully flees or attempts to elude the officer.'" United States v. Coronado-Cura, 713 F.3d 597, 598 (11th Cir. 2013) (quotation omitted). Accordingly, an officer has probable cause to stop an individual for violating section 316.1935(2) when the officer attempts to pull that individual over, "with lights and sirens activated," and the driver fails to pull over. Henderson v. State, 88 So. 3d 1060, 1063 (Fla. 1st DCA 2012). Additionally, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause.'" Grider v. City of Auburn, Ala., 618 F.3d 1240, 1257 (11th Cir. 2010). "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff.'" Id. (quoting Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004)). "If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply." Id. (citing Skop v. City of Atlanta, GA, 485 F.3d 1130, 1138 (11th Cir. 2007)).

Here, Bowman admits that he was aware that Deputy Harvey was attempting to pull him over and that he knew that he was required to stop. Bowman Deposition at 51–52. However, Bowman argues that he did not willfully flee because he was waiting to find a safe place to pullover, and he communicated his intent to stop at a safe place by driving at a reduced speed

and using his turn signal. Response at 7. Even if the Court were to accept Bowman's characterization of his conduct, the Court must analyze a reasonable officer's perception of Bowman's behavior, not Bowman's actual intent. See Jones v. Michael, 656 F. App'x 923, 929–30 (11th Cir. 2016) (the Court must analyze how the situation could "have been perceived to be by a reasonable officer, even if the reasonable perception was mistaken in the ultimate sense").

From the perspective of a reasonable officer, Deputy Harvey had ordered Bowman to pullover with lights, and then lights and sirens, yet Bowman continued driving for approximately one minute having left a well-lit highway and passing viable locations where he could have stopped safely. A reasonable officer would therefore have probable cause to believe that Bowman had violated Florida Statute section 316.1935(2). The fact that Bowman was not speeding during this time does not negate this conclusion. See State v. Kirer, 120 So. 3d 60, 61, 64 (Fla. 4th DCA 2013) (finding that an officer had probable cause for simple vehicle flight even though during the pursuit "[n]either appellee nor the deputy went over approximately '10 miles an hour.'"). Nor does the fact that Bowman believes he travelled only less than a half mile in an attempt to find a safe place to stop compel a different conclusion. See Bowman Deposition at 59; Manners v. Cannella, 891 F.3d 959, 970–71 (11th Cir. 2018) (finding probable cause for the offense of fleeing or attempting to elude a law enforcement officer under Florida law after a motorist continued driving for

three blocks without increasing speed in order to park in a well-lit gas station); Black v. DuFour, No. 3:22-cv-24175-MCR-ZCB, 2023 WL 6378970, at *4 (N.D. Fla. Sept. 29, 2023) (finding probable cause for the offense of fleeing or attempting to elude when the plaintiff drove four blocks to find a place that he felt "comfortable" to pullover). Accordingly, Bowman's explanation does not change the fact that a reasonable officer in Deputy Harvey's position could have perceived Bowman's actions as an attempt to flee. See United States v. Garrette, No. 3:17cr022/MCR, 2017 WL 3337258, at *4 (N.D. Fla. Aug. 4, 2017) ("Neither the speed at which a driver flees nor the distance he travels before finally stopping is determinative of whether probable cause exists for the crime of fleeing or attempting to elude.").

For these reasons, a reasonable officer in Deputy Harvey's position certainly could have had probable cause to believe that Bowman violated Florida Statute section 316.1935(2) when he continued to drive after being ordered to stop. As to the seriousness of this offense, "eluding an officer—a felony under Florida law—is a very serious crime[.]" Williams v. Sirmons, 307 F. App'x 354, 361 (11th Cir. 2009) (per curiam). Thus, the Court finds that this factor weighs in favor of concluding that the force used by Deputy Harvey was reasonable.[17]

---

[17] Even if the Court were to find that the Charger's taillights were operable, as Bowman suggests, this fact would not compel a different conclusion. Notably, "the statutory

The second <u>Graham</u> factor—the danger to officers or others—also supports the reasonableness of Deputy Harvey's use of force. Bowman argues that "there is simply no basis to conclude [that he] posed any type of threat to the Defendant or to the public." Response at 22. The Court is not convinced. As the Supreme Court has noted:

> The attempt to elude capture is a direct challenge to an officer's authority. It is a provocative and dangerous act that dares, and in a typical case requires, the officer to give chase. The felon's conduct gives the officer reason to believe that the defendant has something more serious than a traffic violation to hide.

<u>Sykes v. United States</u>, 564 U.S. 1, 9 (2011), <u>overruled on other grounds</u>, <u>Johnson v. United States</u>, 576 U.S. 591, 606 (2015). As such, "once the pursued vehicle is stopped, it is sometimes necessary for officers to approach with guns drawn to effect arrest. Confrontation with police is the expected result of vehicle flight. It places property and persons at serious risk of injury." <u>Id.</u> at 10.

Here, a reasonable officer could have concluded that Bowman's actions created a threat to officer safety. The record shows that Bowman failed to pullover on a well-lit highway when ordered to do so. He then led Deputy

---

offense of fleeing and eluding does not require the lawfulness of the police action as an element of the offense." <u>State v. McCune</u>, 772 So.2d 596, 597 (Fla. 5th DCA 2000). Thus, Bowman's "act of fleeing or attempting to elude [Deputy Harvey] . . . obviates the necessity of determining whether there was reasonable suspicion or probable cause for the initial attempt to stop." <u>Henderson</u>, 88 So.3d at 1062 (footnotes omitted). Of course, the dashcam video affirmatively establishes that operable or not, the Charger's taillights were not illuminated.

Harvey off of US 441, onto the darker road of Gerson Lane, and into the trailer park. Once stopped, Bowman engaged in a very tense back and forth exchange with Deputy Harvey which lasted almost two minutes. During this exchange, Bowman shouted at Deputy Harvey using phrases such as "you ain't going to shoot me" and "come get me, bro." While Bowman argues that when he made these statements he was "begging to surrender," and was not presenting himself in a "hostile and aggressive manner[,]" Response at 9, a reasonable officer could have perceived these statements as antagonistic and combative. See Draper, 369 F.3d at 1278 (finding that an officer's use of force was not unreasonable where the suspect was "hostile, belligerent, and uncooperative"). Moreover, once Bowman eventually exited the Charger, Deputy Harvey ordered him multiple times to turn around. Bowman did not comply. Deputy Harvey then warned Bowman that he would deploy Drago. Undeterred by this warning, Bowman still did not comply with Deputy Harvey's orders. Instead, he repeatedly told Deputy Harvey to "send the dog, bro." A reasonable officer would not view Bowman's statements as him "begging to surrender," but more likely as a direct act of defiance—and a dare to escalate the situation further. Viewing these facts in their totality, a reasonable officer in Deputy Harvey's position could have perceived Bowman's continued refusal to comply with law enforcement commands to present a threat to officer safety. Accordingly, the Court finds that this factor weighs in favor of a finding of qualified immunity.

The third <u>Graham</u> factor—whether the suspect is actively resisting arrest or attempting to evade arrest by flight—also supports Deputy Harvey's use of force. In the Response, Bowman argues that he complied with all of Deputy Harvey's commands and that he was not attempting to resist arrest. Response at 24. But, the Court finds this contention to be belied by the record. Here, the record establishes that Bowman resisted arrest both before and after Deputy Harvey deployed Drago. Before the officer deployed Drago, Bowman admits that he failed to pullover when ordered to do so by Deputy Harvey. Once stopped at the trailer park, Bowman further admits that he did not comply with Deputy Harvey's commands to turn around. These acts of non-compliance could lead a reasonable officer to believe that Bowman was attempting to resist arrest. Moreover, after Deputy Harvey deployed Drago, Bowman admits that he did not willingly place his hands behind his back when ordered to do so. A reasonable officer could view Bowman's failure to place his hands behind his back as a further attempt to resist arrest.[18] The fact that Bowman did comply

---

[18] Bowman states that although he does not recall whether he willingly placed his hands behind his back when ordered to do so, any failure to comply was a result of him being bitten by Drago. <u>See</u> Bowman Deposition at 69 ("I'm getting bit by a dog at that time, ma'am. I don't – my movements are through pain at that moment[.]"). Even if the Court were to conclude that Bowman did not purposefully fail to comply with Deputy Harvey's commands to place his hands behind his back, and that this failure was merely a result of being bitten by Drago, this would not change how a reasonable officer could view Bowman's actions. As the Eleventh Circuit has explained:

> Given the fact that [the plaintiff] was not fully secured and was continuing to flail around as the officers attempted to handcuff him, a reasonable officer in [the defendant officer's] position could have believed that [the plaintiff] was

with some of Deputy Harvey's commands does not change this conclusion. Notably, Deputy Harvey did not use any physical force during the period of time that Bowman was complying with his commands. Instead, Deputy Harvey only deployed Drago when Bowman refused to turn around and told him to "send the dog, bro." Once he deployed Drago, Deputy Harvey then used additional force only when Bowman did not comply with his order to place his hands behind his back. Considering these facts, a reasonable officer could have concluded that Bowman was attempting to resist arrest when he failed to pullover, failed to turn around when ordered to do so, and failed to place his hands behind his back. For these reasons, the Court finds that this factor weighs in Deputy Harvey's favor.

Accordingly, all three <u>Graham</u> factors—the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is attempting to resist arrest or evade capture

---

actively resisting arrest, or attempting to break free from the officers and flee, and that the use of some force was necessary to bring [the plaintiff] into compliance. This is true even accepting [the plaintiff's] assertion that his movements, rather than being attempts to resist arrest, were merely attempts to remove his bare skin from the hot asphalt . . . . A reasonable officer, reacting quickly under these hectic circumstances, could have interpreted [the plaintiff's] flailing, squirming, and arm movements as attempts to resist arrest.

<u>Marantes v. Miami-Dade Cnty.</u>, 776 F. App'x 654, 665 (11th Cir. 2019) (citing <u>Mobley v. Palm Beach Cnty. Sheriff Dep't</u>, 783 F.3d 1347, 1351, 1355 (11th Cir. 2015)). Similarly, a reasonable officer could have interpreted Bowman's failure to place his hands behind his back as an attempt to resist arrest. This is true even if Bowman's lack of compliance was merely a result of being bitten by Drago.

by flight—weigh in favor of finding Deputy Harvey's use of force to be reasonable. The Court does not end its inquiry there, however. The Eleventh Circuit also instructs district courts to consider three other factors: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted[.]" Lee, 284 F.3d at 1197–98. The Court refers to these as "the Lee factors."

The first Lee factor—the need for the application of force—is answered by the Graham factors themselves. Bowman's decision to leave US 441 and continue driving, his verbal sparring with Deputy Harvey, and his failure to comply with Deputy Harvey's commands show that some level of force was needed to gain control of the situation. See Horn v. Barron, 720 F. App'x 557, 565 (11th Cir. 2018) (per curiam) (holding that an officer was justified in using force to subdue an arrestee, even where that arrestee "was not disobeying a lawful command," because a reasonable officer could have perceived resistance and the threat of further disruption). Additional force was then required when Bowman failed to place his hands behind his back when ordered to do so by Deputy Harvey. Accordingly, this factor weighs in Deputy Harvey's favor.

The second Lee factor—the relationship between the need and amount of force used—also weighs in Deputy Harvey's favor. In his Amended Complaint, Bowman asserts that Deputy Harvey's deployment of Drago was unreasonable.

Amended Complaint ¶ 113.[19] In the Response, he argues that Deputy Harvey allowed "[Drago] to continue to bite [him] after he had been subdued, immobilized, and was offering no resistance." Response at 21; see also id. at 25 ("[Deputy Harvey] allowed K9 Drago to continue to bite Plaintiff, while Plaintiff surrendered and Defendant Harvey was able to immediately effect Plaintiff's arrest."). As a threshold matter, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Lee, 284 F.3d at 1197 (quoting Graham, 490 U.S. at 396). Therefore, "the typical arrest involves some force and injury." Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002) (citing Nolin v. Isbell, 207 F.3d 1253, 1257–58 (11th Cir. 2000)). And a "constitutional violation only occurs when the officer's use of force is 'objectively unreasonable' in light of the totality of the circumstances at the time the force is used." Glover v. Eighth Unknown D.E.A. Agents/Drug Task Force Agents From Birmingham, Alabama Task Force, 225 F. App'x 781, 785–86 (11th Cir. 2007) (quoting Graham, 490 U.S. at 397)).

As to the initial deployment of Drago, the Eleventh Circuit has held that the "Constitution tolerates some uses of a dog" to apprehend a suspect. Edwards

---

[19] Specifically, Bowman alleges that "Defendant HARVEY used unreasonable and excessive force against Plaintiff when" he allowed Drago "to continue to maul [him] until he was handcuffed despite BOWMAN being under [Defendants'] complete control." Amended Complaint ¶ 113.

v. Shanley, 666 F.3d 1289, 1295 (11th Cir. 2012). This makes sense, as "[p]roperly trained police dogs and their handlers serve an important purpose. Availability of this method of search and apprehension can limit an officer's resort to deadly forms of force, such as firearms." Samarco v. Neumann, 44 F. Supp. 2d 1276, 1295 (S.D. Fla. 1999). Consequently, "[t]he use of dogs can make it more likely that officers can apprehend suspects without the risks attendant to the use of firearms . . . thus, frequently enhancing the safety of the officers, bystanders and the suspect." Id. (quoting Robinette v. Barnes, 854 F.2d 909, 914 (6th Cir. 1988)). Additionally, "the Eleventh Circuit has made plain that, as with pepper spray and taser guns, an officer's use of a police dog constitutes non-lethal force." Moulton v. Prosper, No. 18-61260-CIV, 2019 WL 4345674, at *5 (S.D. Fla. Sept. 12, 2019) (citing Edwards, 666 F.3d at 1295)).

Under the circumstances of this case, it cannot be said that an objectively reasonable officer in Deputy Harvey's position would have believed Deputy Harvey's deployment of Drago was excessive. Bowman failed to pullover when ordered to do so; once stopped, he made statements that a reasonable officer could perceive as hostile and belligerent; he then refused to comply with Deputy Harvey's commands to turn around, and provocatively told the deputy to "send the dog, bro." In a quickly evolving situation like this, a reasonable officer could have concluded that some level of force was required to obtain Bowman's compliance. To effectuate this compliance, Deputy Harvey used non-lethal

force—the deployment of Drago. Given the totality of the circumstances, the Court cannot find this decision to have been objectively unreasonable. See Edwards, 666 F.3d at 1295 ("[B]ecause the evidence shows that [the plaintiff] had not yet tried to surrender when [the defendant] allowed his dog to first bite [his] leg, this is the sort of 'split-second' determination made by an officer on the scene that Graham counsels against second guessing.").

As to the duration of Drago's attack, Bowman argues in his Response that he had "surrendered and was not providing any resistance[,]" yet Deputy Harvey allowed Drago to attack him for two–three minutes. Response at 27 (citing Jones Deposition at 106–107). Deputy Harvey disputes that the attack lasted this long, but as the dashcam video shows that, at the absolute outside length the attack could not have lasted any longer than two minutes and twelve seconds, the Court will use this time frame in analyzing the reasonableness of Deputy Harvey's conduct. "In dog bite cases, the 'exact amount of time' is not necessarily 'relevant' to the court's analysis; rather '[t]he significant factor is whether the animal was allowed to continue to maul [a suspect] after he had been subdued and presented no threat to the officers.'" Chatman v. Navarro, No. 14-cv-62793, 2016 WL 9444164, at *5 (S.D. Fla. July 1, 2016) (quoting Bolanos v. Bain By & Through Bain, 696 So. 2d 478, 485 n.5 (Fla. 3rd DCA 1997)). Accordingly, an officer's use of a K9 will be deemed objectively unreasonable when the officer allows the dog to attack a suspect, who has

surrendered and presents no threat, for an extended period of time. <u>See</u> <u>Edwards</u>, 666 F.3d at 1298 (finding it unreasonable for officers to allow a dog to attack a suspect for five to seven minutes after he had surrendered); <u>Priester v.</u> <u>City of Riviera Beach, Fla.</u>, 208 F.3d 919, 923–24 (11th Cir. 2000) (holding that it was unreasonable for officers to allow a K9 to bite a suspect for two minutes when the suspect was compliant, posed no threat to the officers, and was not resisting arrest). On the other hand, an officer's use of a dog will not be deemed objectively unreasonable when the suspect commits a serious crime, is resisting arrest, poses a threat to the safety of the officers, and is not subjected to an unnecessarily prolonged attack. <u>See</u> <u>Crenshaw v. Lister</u>, 556 F.3d 1283, 1292 (11th Cir. 2009); <u>Jay v. Hendershott</u>, 579 F. App'x 948, 951 (11th Cir. 2014) ("[T]he use of a police canine to subdue a suspect is objectively reasonable where the suspect is wanted for the commission of a serious crime, actively flees from police, resists arrest, and is reasonably believed to be armed and dangerous.").

Here, the record does not support an inference that Deputy Harvey allowed Drago to attack Bowman longer than was needed for Deputy Harvey to secure him. When Deputy Harvey deployed Drago, Bowman jumped onto the roof of the Charger. Drago was able to grab ahold of Bowman's leg and drag him to the ground. A brief struggle between the two ensued. While Drago was biting Bowman's leg, Deputy Harvey ordered Bowman to place his hands behind his back. Bowman failed to comply with this command, so Deputy Harvey allowed

Drago to continue his hold on Bowman until Deputy Harvey had Bowman secured in handcuffs. Once he handcuffed Bowman, Deputy Harvey released Drago's hold. In light of these facts, a reasonable officer in Deputy Harvey's position could have believed that the force used was not excessive.

Moreover, the fact that Deputy Harvey waited until he secured Bowman in handcuffs before releasing Drago's hold on Bowman's leg does not change this conclusion. As Deputy Harvey explains, he waited to release Drago's hold because "[Bowman] had to be handcuffed before [he] could ensure [that Bowman] was secure[.]" Motion at 21; Harvey Deposition at 84. The Eleventh Circuit has acknowledged that such a decision would be reasonable as an:

> [Officer] would have been placing himself at risk had he called off the canine before ensuring that [the suspect] was fully secured. This is true regardless of whether [the suspect] was actively resisting arrest at that point, as [the officer] had no reason to trust that [the suspect] would not suddenly attempt to do him harm.

Crenshaw, 556 F.3d at 1293. Likewise, because Bowman had previously failed to comply with Deputy Harvey's orders, it was not unreasonable for Deputy Harvey to conclude that Bowman needed to be handcuffed before Drago could be released. Therefore, on the record before the Court, Bowman has failed to suggest that the amount of time that Drago continued to attack Bowman once he was handcuffed was anything more than merely incidental to Deputy Harvey

ensuring that he was secured, and the scene of the incident was safe.[20]  For these reasons, the Court finds that no reasonable jury would conclude that Deputy Harvey's decision to handcuff Bowman, and then release Drago, was objectively unreasonable. Accordingly, the Court finds that this factor weighs in favor of Deputy Harvey.

The third <u>Lee</u> factor—the extent of the injury inflicted—is likely neutral. Even if not life threatening, Bowman appears to have suffered a serious wound to his leg as a result of Drago's bite. <u>See</u> <u>Crenshaw</u>, 556 F.3d at 1288 (the officer's use of a K9, which resulted in thirty-one different puncture wounds to the plaintiff's leg, was not objectively unreasonable). Yet, the evidence does not suggest that the injury was greater than what was needed for Deputy Harvey to ensure Bowman's compliance, when obtaining compliance required the use

---

[20] The Court notes that Bowman has not pled, let alone argued in his Response, that Deputy Harvey allowed Drago to bite him for an excessive period of time after he was secured in handcuffs. In his Amended Complaint, Bowman alleges that "DRAGO was allowed to continue to maul [him] until he was handcuffed[.]" Amended Complaint ¶ 113. And that "[Deputy Harvey] forcibly handcuffed [him] and it was not until after that he finally removed DRAGO from the apprehension." <u>Id.</u> ¶ 51. And in the Response, Bowman has not argued that Deputy Harvey allowed Drago to attack him for an excessive period of time after he was handcuffed, nor has he cited any evidence in the record that would support such a finding. Even if Bowman had made this argument, however, this would be improper as a "plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004). Accordingly, because Bowman does not claim that Deputy Harvey allowed Dargo to attack him for an excessive period of time after he was handcuffed, and because he does not make this argument in his Response, the Court cannot conclude that there is a genuine issue of fact for trial on the question of whether Deputy Harvey's decision to handcuff Bowman before releasing Drago from his leg was objectively unreasonable. <u>See</u> <u>Crenshaw</u>, 556 F.3d at 1293 ("While it would have been objectively unreasonable for [the defendant] to allow the canine to continue attacking [the plaintiff] <u>after</u> he was secured . . . [the plaintiff] does not allege that this occurred.").

of Drago.

Upon consideration of the record, and construing all disputed facts and reasonable inferences in Bowman's favor, Bowman cannot show that Deputy Harvey's use of force against him was objectively unreasonable. Given Bowman's failure to pullover, his lengthy and antagonistic verbal sparring with Deputy Harvey, his refusal to turn around when ordered, and his failure to place his hands behind his back, Deputy Harvey reasonably could have believed that the use of Drago was necessary to gain control of Bowman. Accordingly, Deputy Harvey's use of Drago did not violate Bowman's Fourth Amendment rights. The Court thus determines that Bowman has failed to show a genuine issue of fact for trial on his claim against Deputy Harvey. Therefore, Deputy Harvey is entitled to qualified immunity and summary judgment is due to be entered in his favor on Count I of the Amended Complaint. See Vinyard, 311 F.3d at 1346 ("An officer will be entitled to qualified immunity . . . if an objectively reasonable officer in the same situation could have believed that the force used was not excessive.").

### ii. Clearly Established

Even if the Court were to find that the force used by Deputy Harvey was unconstitutionally excessive, Bowman fails to point to authority supporting a conclusion that Deputy Harvey violated a clearly established constitutional right. See Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004),

abrogated on other grounds by Williams v. Aguirre, 965 F.3d 1147 (11th Cir.

2020). As the Supreme Court has explained:

> For a constitutional right to be clearly established, its contours
> "must be sufficiently clear that a reasonable official would
> understand that what he is doing violates that right. This is not to
> say that an official action is protected by qualified immunity unless
> the very action in question has previously been held unlawful, but
> it is to say that in the light of pre-existing law the unlawfulness
> must be apparent."

Hope, 536 U.S. at 739 (citation omitted) (quoting Anderson v. Creighton, 483

U.S. 635, 640 (1987)). For purposes of this analysis, the critical question is

whether the state of the law gave the government actor "fair warning" that his

alleged treatment of the plaintiff was unconstitutional. Vinyard, 311 F.3d at

1350 (quoting Hope, 536 U.S. at 741); see also Marsh, 268 F.3d at 1031 ("[F]air

and clear notice to government officials is the cornerstone of qualified

immunity[.]"). The Eleventh Circuit recognizes three sources of law that would

provide a government official adequate notice of statutory or constitutional

rights: "specific statutory or constitutional provisions; principles of law

enunciated in relevant decisions; and factually similar cases already decided by

state and federal courts in the relevant jurisdiction." Harper v. Lawrence

County, Ala., 592 F.3d 1227, 1233 (11th Cir. 2010) (quoting Goebert v. Lee

County, 510 F.3d 1312, 1330 (11th Cir. 2007)). Thus, where the words of the

federal statute or federal constitutional provision are specific enough "to

establish clearly the law applicable to particular conduct and circumstances,"

then the plaintiff can overcome the qualified immunity privilege, even in the absence of case law. Vinyard, 311 F.3d at 1350. In this type of "obvious clarity" case, "the words of the federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." Id.

Alternatively, where the conduct alleged is not so egregious as to violate a statutory or constitutional right on its face, courts look to case law to determine whether the law is "clearly established." Id. at 1351. If the case law contains "some broad statements of principle" which are "not tied to particularized facts," then it may be sufficient to clearly establish the law applicable in the future to different facts. Id. However, to provide officials with sufficient warning, the case law must establish a principle with such "obvious clarity" that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Id. Last, in the absence of broad statements of principle, precedent can clearly establish the applicable law where "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar," to the particularized facts of prior case law. Id. at 1352. Such precedent must be found in decisions from the Supreme Court, the controlling circuit court of appeals, or the pertinent state supreme court. Id. at 1351. Although such a case "on all fours" with materially identical facts is not

required to establish "fair warning" to government officials, see Holloman ex

rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004) (discussing the

impact of Hope on Eleventh Circuit precedent), "existing precedent must have

placed the statutory or constitutional question beyond debate." See Mullenix,

577 U.S. at 12 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).

In his Response, Bowman cites to Priester v. City of Riviera Beach, Fla.,

208 F.3d 919 (11th Cir. 2000) for the proposition that Deputy Harvey's use of

force was clearly excessive. Response at 26. In Priester, the plaintiff, who had

stolen $20 worth of goods, surrendered to law enforcement when confronted,

posed no threat to the officers or their safety, did not attempt to resist or flee,

and yet the officer allowed a K9 to attack him for two minutes:

> Plaintiff was a suspect in the burglary of a golf shop. Approximately
> $20 of snacks and crackers were stolen. When the police discovered
> Plaintiff, he submitted immediately to the police. When ordered by
> Defendant Wheeler to get down on the ground, Plaintiff complied.
> There was no confusion. Plaintiff did not pose a threat of bodily
> harm to the officers or to anyone else. And, he was not attempting
> to flee or to resist arrest. On Plaintiff's version of the facts, which
> we must accept, Defendant Wheeler ordered and allowed his dog to
> attack and bite Plaintiff; threatened to kill Plaintiff when Plaintiff
> kicked the dog in an effort to resist the unprovoked attack; and let
> the dog attack Plaintiff for at least two minutes.

Id. at 927. The Eleventh Circuit held that "[n]o reasonable police officer could

believe that this force was permissible given these straightforward

circumstances." Id. This case, however, bears little resemblance to Priester. As

discussed in detail above, Bowman refused to comply with Deputy Harvey's

order to pullover (a felony); once stopped, he engaged in a tense verbal exchange with Deputy Harvey; when ordered to turn around, he refused to comply and goaded Deputy Harvey to "send the dog, bro"; and once on the ground, he failed to place his hands behind his back when ordered to do so. Unlike the plaintiff in Priester, Deputy Harvey reasonably could have believed Bowman posed a threat to the officers' safety as he refused to comply with his commands and attempted to resist arrest. As a sister court has aptly noted, "Priester stands only for the limited—and somewhat self-evident—proposition that, where a suspect obeys an officer's demands and lies down compliantly on the ground, that officer may not then deploy a police dog to maul the suspect anyway[.]" Moulton, 2019 WL 4345674, at *9. That is not what happened here. Accordingly, it cannot be said that Priester would have put a reasonable officer on notice that the conduct of Deputy Harvey was unconstitutional. See Priester, 208 F.3d at 926. ("[U]nless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity.").[21]

---

[21] Bowman does not cite to any other cases for the proposition that Deputy Harvey's conduct was a clearly established violation of the Fourth Amendment. That being said, the Eleventh Circuit noted, albeit in a non-binding unpublished decision, "[a]ssuming that being bitten by a police dog while resisting arrest violates a constitutional right, [the plaintiff] cannot show that this right was clearly established at the time of his arrest. The closest cases that a plaintiff might rely upon in an effort to establish such a right merely hold that a police dog bite after a defendant has been subdued, surrendered, or has ceased resisting or fleeing would violate the suspect's constitutional rights." Lafavors v. Jenne, No. 05-14410, 2006 WL 249544, at *2 (11th Cir. Feb. 2, 2006) (citations omitted).

Moreover, this is not the sort of case where it is apparent, with "obvious clarity," that Deputy Harvey's conduct was unconstitutional. See Vinyard, 311 F.3d at 1350. In the face of an individual who has fled officers, is verbally hostile, and refuses to comply with commands, it cannot be said that the use of a K9 in the manner shown here to apprehend that individual is so clearly excessive as to warrant the denial of qualified immunity in the absence of any case law. For these reasons, even if Bowman could show the violation of a constitutional right, he has not shown that this right had been clearly established.[22]

### C.    Excessive Force – Deputy Gohde (Count II)

In Count II, Bowman argues that Deputy Gohde violated his constitutional rights by failing to prevent Deputy Harvey from deploying Drago, and failing to intervene once Drago was deployed. Amended Complaint at 26. Deputy Gohde contends that she is entitled to summary judgment because the force used by Deputy Harvey was not excessive, and she therefore did not have

---

[22] Bowman does not address whether Deputy Harvey's decision to handcuff him before releasing Drago from his leg is a clearly established violation of the Fourth Amendment. Nonetheless, the Court finds that the unconstitutional nature of this conduct—if presumed to be unconstitutional—has not been clearly established. As noted earlier, an "[officer] would have been placing himself at risk had he called off the canine before ensuring that [the suspect] was fully secured. This is true regardless of whether [the suspect] was actively resisting arrest at that point, as [the officer] had no reason to trust that [the suspect] would not suddenly attempt to do him harm." Crenshaw, 556 F.3d at 1293. For this reason, "the court cannot conclude that a twenty to thirty second delay in releasing a bite is so obviously unconstitutional that no caselaw is needed to hold a police officer liable in these circumstances." Matthews v. Huntsville City Police Dep't, No. 5:17-cv-02195-ACA-JHE, 2020 WL 4593782, at *7 (N.D. Ala. Aug. 11, 2020).

a duty to intervene. Motion at 27. Generally, an officer may be "held liable under § 1983, even if [s]he did not use excessive force [herself], if [s]he was 'present at the scene and . . . fail[ed] to take reasonable steps to protect the victim of another officer's use of excessive force.'" Hunter v. Leeds, City of, 941 F.3d 1265, 1282 (11th Cir. 2019) (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008)). "To be held liable on a theory of nonfeasance, the officer must have been in a position to intervene but failed to do so." Id. (citing Priester, 208 F.3d at 924). However, "an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed." Sebastian v. Ortiz, 918 F.3d 1301, 1312 (11th Cir. 2019). Summary judgment is therefore warranted "for the remaining officers who did not participate directly in the arrest because a police officer has no duty to intervene in another officer's use of force when that use of force is not excessive." Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1347, 1357 (11th Cir. 2015).

Here, Bowman argues that Deputy Gohde was in a position to prevent Deputy Harvey from deploying Drago, and that once Drago was deployed, she had a duty to release Drago's hold on his leg. Response at 29. As the Court has already found that summary judgment is due to be entered in Deputy Harvey's favor as to Bowman's claim that Deputy Harvey used excessive force, the Court necessarily finds that Deputy Gohde had no duty to intervene. See Mobley, 783

F.3d at 1357. Accordingly, Deputy Gohde is entitled to summary judgment on Count II of the Amended Complaint.

### D.    Malicious Prosecution – Deputy Harvey (Count IX)

In Count IX, Bowman asserts that Deputy Harvey violated his Fourth Amendment right to be free from malicious prosecution. Amended Complaint at 37. Specifically, Bowman argues that Deputy Harvey lacked probable cause to pull him over, and that he made fraudulent statements when applying for the warrant affidavit. Response at 31–32. To prevail on a malicious prosecution claim under 42 U.S.C. § 1983, "the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." Grider, 618 F.3d at 1256. "As to the first prong, the constituent elements of the common law tort of malicious prosecution are: '(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused.'" Id. (quoting Wood v. Kesler, 323 F.3d 872, 882 (11th Cir. 2003)). As for the second prong, a plaintiff meets his burden when he establishes "(1) that the legal process justifying the seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." Williams v. Aguirre, 965 F.3d 1147, 1165 (11th Cir. 2020).

i.  Bowman's  Arrest  for  Violating  Florida  Statute  Section  316.1935(2)

Bowman argues that because he "voluntarily stopped his vehicle" Deputy Harvey "could not have [had] probable cause to arrest" him for fleeing or attempting to elude. Response at 31. As discussed previously, this argument is unavailing. Based on the undisputed facts, Deputy Harvey had probable cause to believe that Bowman violated Florida Statute section 316.1935(2) when he failed to pullover when ordered to do so. The fact that Bowman did eventually stop his vehicle voluntarily does not change this conclusion. See Garrette, 2017 WL 3337258, at *4 ("Neither the speed at which a driver flees nor the distance he travels before finally stopping is determinative of whether probable cause exists for the crime of fleeing or attempting to elude."). Accordingly, Bowman cannot show that Deputy Harvey initiated criminal proceedings against him for fleeing or attempting to elude "with malice and without probable cause." Grider, 618 F.3d at 1256 (quotation omitted).

Bowman also argues that because "there was no probable cause to effectuate an arrest for fleeing and eluding" Deputy Harvey had to fabricate "the circumstances surrounding" this offense in his warrant affidavit. Response at 32. "A police officer who applies for an arrest warrant can be liable for malicious prosecution if he should have known that his application 'failed to establish probable cause,' or if he made statements or omissions in his

application that were material and 'perjurious or recklessly false[.]'" <u>Black v. Wigington</u>, 811 F.3d 1259, 1267 (11th Cir. 2016) (internal citation omitted) (quoting <u>Kelly v. Curtis</u>, 21 F.3d 1544, 1553–54 (11th Cir. 1994)). Here, Bowman does not explain what statements in Deputy Harvey's warrant affidavit are false. Instead, he simply argues that because he did not attempt to flee, Deputy Harvey lacked probable cause, and must have therefore fabricated the contents of his affidavit. This argument is unavailing for two reasons. First, Bowman has failed to identify any facts that would plausibly suggest that the statements made by Deputy Harvey in his warrant affidavit are false:

> [I]n order to sufficiently plead a claim of malicious prosecution based on alleged falsities or fabrications in an affidavit, the plaintiff must "allege facts to plausibly suggest that [the defendant] did not believe or appropriately accept as true his ultimate assertion that [the plaintiff] was guilty. This requires some evidence establishing [the defendant's] subjective belief about the veracity of the assertions made in his affidavit."

<u>Rhodes v. Robbins</u>, No. 3:18-cv-673-J-34JBT, 2019 WL 1160828, at *15 (M.D. Fla. Mar. 13, 2019) (quoting <u>Carter v. Gore</u>, 557 F. App'x 904, 910 (11th Cir. 2014)). Second, the allegations in the warrant affidavit establish that Deputy Harvey had probable cause. <u>See</u> <u>Grider</u>, 618 F.3d at 1256 ("[T]he existence of probable cause defeats a § 1983 malicious prosecution claim."). Thus, because Bowman has provided no evidence that Deputy Harvey made any false statements in his affidavit, and because the affidavit itself establishes probable cause, Deputy Harvey is entitled to summary judgment on Bowman's claim for

malicious prosecution as to the charge of fleeing or attempting to elude. See Black, 811 F.3d at 1267.

ii. Deputy Harvey's Warrant Affidavit – Driving Under the Influence

Bowman argues that because "Defendants make no argument for summary judgment as it pertains to malicious prosecution of the DUI charges . . . Defendants waived summary judgment on the § 1983 malicious prosecution claim pertaining to the DUI charges filed against Plaintiff." Response at 30. The Court does not read Defendants' Motion so narrowly. Notably, in his Amended Complaint, Bowman states that "HARVEY wrongfully caused criminal proceedings to be instituted against Plaintiff BOWMAN by submitting police reports to prosecuting authorities containing false statements and/or material omission[s], and from which reports were relied on by prosecuting authorities." Amended Complaint at 37. Bowman further asserts that "[b]ased on the story that Defendant HARVEY fabricated, the State Attorney's Office brought a DUI charge against the Plaintiff. This charge was ultimately dismissed by the State." Id. Although in the Motion Defendants do not specifically reference Bowman's DUI charge, Defendants moved for summary judgment arguing that "Plaintiff cannot establish that Deputy Harvey made an intentional or reckless misstatement [in his warrant affidavit] that if negated would have rendered a different result." Motion at 31. In making

this argument, Defendants defended the veracity of Deputy Harvey's statements in the warrant affidavit, and that necessarily involves Bowman's allegation that Harvey made false statements as it pertains to the DUI charge. Therefore, this issue is properly before the Court.

As to the merits of this claim, the Court finds that Deputy Harvey had arguable probable cause to swear out the warrant affidavit accusing Bowman to have been driving under the influence. In the warrant affidavit, Deputy Harvey attested that "[d]uring my contact with Martinezz I detected the odor of alcoholic beverage emitting from his breath. I also detected the odor of marijuana emitting from the vehicle. After seeing Martinezz's actions it was suspected he was possibly intoxicated. The intoxication possibly altered his decision making skills." Warrant Affidavit at 1. Deputy Harvey further attested that "Deputy Gohde requested that Martinezz provide a sample of Blood to determine his impairment. Martinezz told her no." Id. These facts are sufficient to give a reasonable officer arguable probable cause to believe that Bowman had been driving under the influence. As explained by the Eleventh Circuit:

> Whether or not [the officer] had probable cause to arrest [the plaintiff] because the officer smelled alcohol coming from the vehicle, the officer did have reasonable suspicion. He reasonably detained [the plaintiff] in order to investigate whether he had been driving under the influence. From this detention, probable cause developed, justifying [the plaintiff's] arrest, because [the plaintiff] refused to take a breathalyzer test.

Miller v. Harget, 458 F.3d 1251, 1259–1260 (11th Cir. 2006).

Here, although Bowman denies that he was drinking, he does not challenge the veracity of Deputy Harvey's statement that Deputy Harvey believed he smelled the odor of alcohol and marijuana on Bowman. This gave Deputy Harvey reasonable suspicion to believe that Bowman had been driving under the influence. Deputy Gohde then requested that Bowman submit to a blood sample test, which he refused to do. This refusal, paired with the odor of alcohol and marijuana and Bowman's refusal to promptly stop, gave Deputy Harvey arguable probable cause to believe that Bowman had been driving under the influence. Moreover, Bowman has failed to provide any evidence that Deputy Harvey made false statements in swearing out the warrant affidavit and accusing him of committing this offense. See Rhodes, 2019 WL 1160828 at *15. For these reasons, Deputy Harvey is entitled to qualified immunity on this portion of Bowman's malicious prosecution claim as well, and summary judgment is due to be entered in his favor.

In sum, Deputy Harvey had probable cause to believe that Bowman had violated Florida Statute section 316.1935(2), and Bowman cannot show that Deputy Harvey made false statements in swearing out the warrant affidavit accusing him of committing this offense. Deputy Harvey also had arguable probable cause to accuse Bowman of driving under the influence, and Bowman has not provided any evidence that Deputy Harvey fabricated the basis for this charge. Accordingly, the Court finds that Deputy Harvey is entitled to qualified

immunity and that summary judgment is due to be entered in his favor as to Count IX of the Amended Complaint.[23]

### E.    State Law Claims

Having determined that summary judgment is due to be granted in favor of Defendants as to Bowman's federal claims, the Court next considers whether to continue to exercise supplemental jurisdiction over the remaining state law claims. At the time the instant case was filed, the Court had original jurisdiction over the federal claims, see 28 U.S.C. § 1331, as well as supplemental jurisdiction over Bowman's state law claims, see 28 U.S.C. § 1367(a). See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). However, § 1367(c)(3) gives a court discretion to dismiss or remand to state court claims before it on the basis of supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). Indeed, the Eleventh Circuit has held that a district court may properly decline to exercise jurisdiction over supplemental state law claims when the federal claims over which the Court had original jurisdiction are dismissed on a motion for summary judgment, as is the case here. See Murphy v. Fla. Keys Elec. Co-op Ass'n, Inc., 329 F.3d 1311, 1320 (11th Cir. 2003)

---

[23] Notably, "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (internal quotations omitted).

(affirming summary judgment on defendant's contribution claim invoking admiralty jurisdiction, and affirming dismissal of third-party defendant's state law counterclaim under 28 U.S.C. § 1367(c)); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999) ("If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."); Eubanks v. Gerwen, 40 F.3d 1157, 1162 (11th Cir. 1994) (stating that since the "federal claims [had] been disposed of rather early on at the summary judgment phase[,] . . . comity suggests that the remaining state law malicious prosecution claim should be heard in state court"); see also Maschmeier v. Scott, 508 F. Supp. 2d 1180, 1185–86 (M.D. Fla. 2007) (declining to exercise supplemental jurisdiction over the plaintiff's state law claim after granting summary judgment in favor of the defendant on the plaintiff's federal claims).

In deciding whether to exercise supplemental jurisdiction over state law claims, district courts consider "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims[,]" as well as "the values of judicial economy, convenience, fairness, and comity." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997) (internal quotations omitted) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). "When the balance of these factors indicates that a case properly belongs in state court, as when

the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." Cohill, 484 U.S. at 350 (citing Gibbs, 383 U.S. at 726–27) (footnote omitted); Gibbs, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (stating that the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial") (citing L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)). Notably, the Supreme Court's directive in Cohill concerning when a district court should decline to continue to exercise supplemental jurisdiction "was not intended to 'establish a mandatory rule to be applied inflexibly in all cases,'" but "it did establish a general rule to be applied in all but extraordinary cases." Carr v. Tatangelo, 156 F. Supp. 2d 1369, 1380 (M.D. Ga. 2001) (citing Cohill, 484 U.S. at 350 n.7), aff'd, 338 F.3d 1259 (11th Cir. 2003). Moreover, because "[s]tate courts, not federal courts, should be the final arbiters of state law," dismissal of state law claims is strongly encouraged when federal claims are dismissed prior to trial. Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997).

Here, the Court has determined that summary judgment in favor of

Defendants is proper with regard to Bowman's federal claims. Because the federal claims have been dismissed prior to trial, the Court has the authority under § 1367(c) to decline to retain jurisdiction over the remaining state law claims. See Murphy, 329 F.3d at 1320; Carr, 156 F. Supp. 2d at 1380 (dismissing state law claims without prejudice after finding the defendants to be entitled to qualified immunity as to the federal claims and noting that it is preferable for state courts to "make rulings on issues of [state] law"). As such, the Court declines to continue to exercise supplemental jurisdiction over Counts V and VI of the Amended Complaint, and these counts are due to be dismissed without prejudice.[24]

## IV.  Conclusion

Upon consideration of the record and the parties' arguments, the Court makes the following findings. As to Count I, a reasonable officer in Deputy Harvey's position could have believed the force he used in deploying Drago was reasonable, and even if the force used was excessive, Bowman has failed to show that the unreasonableness of such a use of force had been clearly established.

---

[24] The Court notes that Bowman's state law claims are governed by Florida's four year statute of limitations. Florida Statute section 95.11(3) provides, with certain exceptions not applicable here, that claims for "assault, battery, false arrest, malicious prosecution, malicious interference, false imprisonment, or any other intentional tort" are subject to a four year limitations period. Fla. Stat. section 95.11(3)(n). As Bowman's claims arose on October 23, 2020, he may, if he so chooses, re-file these claims in state court. See Harris v. Rambosk, No. 2:18-cv-17-FtM-29MRM, 2018 WL 5085721, at *6 (M.D. Fla. Oct. 18, 2018) (an "assault and battery claim accrues on the date the alleged assault and battery occurred").

Thus, Deputy Harvey is entitled to qualified immunity and summary judgment is due to be entered in his favor as to Count I. As to Count II, Deputy Gohde is entitled to qualified immunity because she did not have a duty to prevent Deputy Harvey's arguably lawful use of Drago. Thus, summary judgment is due to be entered in her favor as to Count II. As to Count IX, Deputy Harvey is entitled to qualified immunity because he had probable cause to believe that Bowman violated Florida Statute section 316.1935(2) and had arguable probable cause to believe that Bowman was driving under the influence. Moreover, Bowman has failed to provide any evidence that Deputy Harvey made false statements in the warrant affidavit. Therefore, Deputy Harvey is entitled to qualified immunity and summary judgment is due to be entered in his favor as to Count IX. Finally, the Court declines to exercise supplemental jurisdiction over Bowman's state law claims, Counts V and VI, and these Counts are due to be dismissed without prejudice.

Accordingly, it is

**ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. 81) is **GRANTED in-part** and **DENIED in-part.**

2. The Motion is **granted** with respect to Counts I, II, and IX of the Amended Complaint, and the Clerk of the Court is directed to enter

**JUDGMENT** in favor of Defendants David Harvey and Jayme Gohde, and against Plaintiff Martinezz Bowman as to these counts.

3. The Motion is **denied** as to Counts V and VI of the Amended Complaint. In the exercise of its discretion under 28 U.S.C. § 1367(c), the Court declines to continue to exercise jurisdiction over these claims, and Counts V and VI are **dismissed without prejudice** to Bowman refiling those claims in state court if he so chooses.

4. The Clerk of the Court is further directed to terminate any pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 27th day of March, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

Lc32
Copies to:

Counsel of Record